# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEBRASKA

| | |
|---|---|
| ALICE JOHNSON and NORMA LEROY, as PARENTS, NATURAL GUARDIANS, and NEXT FRIENDS OF A.S. and M.L., Minor Children; ALICE JOHNSON, individually; and NORMA LEROY, individually, | **Case No. 4:21-CV-03103** |
| Plaintiffs, | |
| vs. | **AMENDED COMPLAINT AND JURY DEMAND (42 U.S.C. §1983)** |
| CODY-KILGORE UNIFIED SCHOOL DISTRICT, a Political Subdivision; ADAM LAMBERT, in his individual capacity; and MARVANNE LOGTERMAN, in her individual capacity, | |
| Defendants. | |

## I.   INTRODUCTION

1.      Similar to assimilationist policies implemented in boarding schools in the 19th and 20th centuries to erase the Native American[1] culture, a Nebraska school district and its staff implemented a policy or custom treating Native American and non-Native students differently when checking their hair for lice. Pursuant to this policy or custom, school officials—entrusted with protecting students from discrimination and creating an inclusive, respectful learning environment—discriminated against Native American students and infringed upon their Lakota culture, traditions, and beliefs by cutting their hair without their parents' consent and inexplicably storing it at the school. Defendants' actions forever breached Plaintiffs' trust and inflicted indelible injuries on Plaintiffs.

---

[1] The terms "Native American" and "Lakota" refer herein to any indigenous person or group of the Americas and their interconnected religious beliefs, including the Lakota Rosebud Sioux Tribe.

2.      This is an action to vindicate Plaintiffs' rights under federal law and the United States Constitution.

## II.  PARTIES AND JURISDICTION

3.      A.S. is a minor and resident of the City of Kilgore, Nebraska. At the time of the acts giving rise to the underlying causes of action, A.S. was ten years old and a student at Cody Kilgore Unified Schools Elementary of the Cody Kilgore Unified School District (hereinafter "School District"), a public school district, and entrusted to the care of Defendant Marvanne Logterman, Defendant Adam Lambert, and School District officials.

4.      M.L. is a minor and resident of the City of Kilgore, Nebraska. At the time of the acts giving rise to the underlying causes of action, M.L. was six years old and a student at Cody Kilgore Unified Schools Elementary of Defendant School District, and entrusted to the care of Defendant Logterman, Defendant Lambert, and School District officials. As a result of her diagnosed disabilities related to her autism, M.L. is eligible for special education services and supports pursuant to federal law.

5.      Alice Johnson (hereinafter "Alice") is a resident of the City of Kilgore, Nebraska and the parent and natural mother of A.S. She brings this action on behalf of her daughter A.S. and in her individual capacity.

6.      Norma LeRoy (hereinafter "Norma") is a resident of the City of Kilgore, Nebraska and the parent and natural mother of M.L. She brings this action on behalf of her daughter M.L. and in her individual capacity.

7.      The School District is a political subdivision organized and operating under the laws of the State of Nebraska. During the 2019-2020 school year, the School District, through its agents, employees and representatives provided educational programs and activities to enrolled children residing within its geographical boundaries, including A.S. and M.L. The School

District is a "program or activity receiving Federal financial assistance" as defined by Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

8.      Defendant Adam Lambert is a resident of Nebraska and was employed by Defendant School District during the 2019-2020 school year as the Principal and Superintendent for the Elementary School and School District, respectively. Lambert possessed final authority to establish municipal policy with respect to the actions taken by Defendant School District and Defendant Logterman as alleged herein. Specifically, according to School District Policy # 4025, Lambert was delegated the "general power and authority to make necessary decisions to ensure the efficient and effective operations of the school" and "the authority to hire and terminate employment."[2] At all relevant times herein, Defendant Lambert acted under color of law. Defendant Lambert is sued in his individual capacity.

9.      Defendant Marvanne Logterman is a resident of South Dakota and was employed by Defendant School District during the 2019-2020 school year as an Elementary Administrative Assistant. On information and belief, Logterman was charged with conducting head lice checks of students at the School District's elementary school. At all relevant times, Logterman was acting under color of law. Defendant Logterman is sued in her individual capacity.

10.      Jurisdiction is proper pursuant to § 28 U.S.C. §1331, as this matter arises under the Constitution and laws of the United States: specifically, 42 U.S.C. §1983; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; the Free Exercise clause of the U.S. CONST. amend I; and the Equal Protection clause of the U.S. CONST. amend XIV.

11.      Venue is proper in the District of Nebraska because all relevant events occurred within the District of Nebraska.

---

[2] CODY-KILGORE UNIFIED SCH., DIST. POLICIES: SUPERINTENDENT § 4025, *available at* (https://core-docs.s3.amazonaws.com/documents/asset/uploaded_file/993276/4025_Superintendent.pdf.

3

## III. FACTS

**A. Plaintiffs' Religious Beliefs**

12.    A.S., M.L., Alice, and Norma are Rosebud Sioux Tribe members who practice traditional Lakota religious tenets.

13.    The School District has generally been informed and made aware of the children's Native-American ancestry, affiliation, and religious beliefs with the Rosebud Sioux Tribe prior to Ms. Logterman's conduct at issue herein via the Plaintiffs' annual application for Free and Reduce Price school meal program, school enrollment forms, various other school records, and verbal conversations where A.S. and M.L.'s race or religion is indicated.

14.    A.S. and M.L.'s specific traditional Lakota beliefs and practices were explicitly relayed to Defendants Lambert and Logterman by their parents, Alice and Norma, in religious opposition to Ms. Logterman's conduct after they first learned about the conduct at issue herein.

15.    For many Native Americans across various tribes, including the Lakota, hair is regarded as an extension of their physical being and can symbolize mourning.[3]

16.    A.S. and M.L. have been taught traditional Lakota beliefs and practices by Alice and Norma since they were very young. These teachings have included the belief that their hair should be kept long as a sacred symbol of their own life and cut only under specific circumstances such as after the death of a loved one.

17.    In conformance with their traditional Lakota religion, heritage, and identity regarding their hair and haircuts, A.S. and M.L. maintain their hair long and only permit select individuals to cut their hair on particular occasions and under a parent's supervision. One of those occasions occurs when A.S. and M.L. have their hair trimmed by the same hair salon

---

[3] *See generally Teterud v. Burns,* 522 F.2d, 357, 360, n.5, n.6 (8th Cir. 1975).

specialist or their grandfather, both Native American, under Alice or Norma's supervision during the full moon phase. Such hair trims are conducted in conformance with their beliefs and practices, including for example the belief that the individual cutting their hair shall not be on their menstrual period during their haircut. It is the Plaintiffs' belief that a menstruating individual should be cleansing and has too strong of an aura during this time which will negatively impact the individual having their hair cut.

18.     It is Plaintiffs' sincerely held belief that if their hair is cut to commemorate life-changing events, or is brushed out of the scalp or trimmed, the hair must be burned in order to protect their overall health and life.

**B. School District's Written Policies and Procedures**

19.     As reflected by the Student Handbook, Defendant School District's written head lice policy for the 2019-2020 school year states "[s]tudents found to have live head lice or louse eggs will not be permitted at school and will be sent home. Upon discovering the presence of any indication of lice or louse eggs the student's parent(s) or guardian(s) will be notified, and if appropriate will be asked to pick up the student from school immediately." The relevant portion of the handbook is attached hereto, marked Exhibit A and incorporated herein by reference.

20.     There are no other written policy provisions governing checks for head lice.

21.     There are no written policy provisions authorizing officials to cut children's hair for the purpose of checking for lice.

**C. School District's Unwritten Native American Head Lice Haircut Policy or Custom**

22.     Defendants adopted and enforced a different policy or custom when checking Native American students for lice, as reflected by:

5

     a.   A letter written by Defendant Lambert to Alice and Norma on or about March 10, 2020 attaching a single strand of hair. A copy of the letter is attached hereto, marked Exhibit B and incorporated herein by reference; and

     b.   A letter written by Defendant Lambert sent to Plaintiffs' counsel by e-mail on March 19, 2020. A copy of the letter is attached hereto, marked Exhibit C and incorporated herein by reference.

23.    Defendant Lambert's March 10th letter thanks Alice, Norma, and the elder Lakota Tribe members for presenting at the Defendant School District's board meeting regarding their Lakota culture and further reads, "Moving forward, if the district suspects lice or nits on your child, a phone call will be made home for you to come and pick up your child from school." (Ex. B). By his letter, Lambert admits Defendants were following a different policy or custom for Native American students at the time A.S. and M.L.'s hair was cut.

24.    Defendant Lambert's March 19th letter also admits Defendants were not following their written policy, and instead following a different policy or custom for Native American students at the time Ms. Logterman cut the hair of A.S. and M.L. Lambert's letter (inaccurately) summarizes a process used for schools on Tribal grounds wherein "the school cuts a single hair, tapes it to a piece of paper, and sends it home to the family" and states "[t]hat [it] is *precisely* the procedure that was used [with A.S. and M.L.,]." (Ex. C.) This letter is an admission by Defendant Lambert that he approved the process of cutting the hair of Native American students and sending it home taped to a piece of paper, contrary to the School District's written policy.

25.    On information and belief, school officials only cut the hair of Native American students during head lice checks.

**D. Violation of Plaintiffs' Religious Beliefs and Discrimination based on Race and Religion**

26.     Pursuant to the School District's unwritten Native American head lice haircut policy or custom (hereinafter, "unwritten policy"), Logterman cut strands of A.S. and M.L.'s hair on at least four occasions between the week of February 24, 2020 and March 6, 2020, without Alice or Norma's consent.

27.     On March 2, 2020, A.S. was sent home early from school due to alleged head lice. While explaining why she was home early, A.S. told Alice that Logterman had cut her hair while she was at school without Alice or A.S.'s consent.

28.     During Alice's conversation with A.S., Alice also learned that A.S. and M.L.'s cousin, also Native American, had her hair cut by Logterman, also apparently pursuant to the unwritten policy.

29.     After learning that Logterman cut A.S.'s hair on March 2, 2020, Alice immediately reported Logterman's actions to Defendant Lambert in his capacity as Principal and Superintendent of the School District. Alice specifically requested that the school stop cutting her daughters' hair in violation of their Lakota beliefs regarding haircuts.

30.     On or about March 3, 2020, Alice received a phone call from Lambert explaining he had spoken to Logterman but did not provide Alice with any details about the conversation.

31.     Between Alice's first call to Defendant Lambert on March 2, 2020, and March 4, 2020, Lambert did not direct Logterman to stop cutting her daughters' hair.

32.     Neither Logterman, Lambert, nor any other agent or employee of Defendant School District took any other remedial action in response to Alice's report that A.S. had her hair cut at school before March 4, 2020.

7

33.     On March 4, 2020, Alice received a phone call from Logterman informing her that A.S. might have head lice and that she had cut A.S.'s hair again. The haircut took place in Logterman's office after Logterman's conversation with Lambert. (Ex. C.).

34.     On March 5, 2020, M.L. informed Norma that Logterman had cut her hair during school hours in her office.

35.     Upon inspection, Norma noticed two patches of really short hair close to M.L.'s scalp.

36.     After learning that Logterman cut M.L.'s hair on March 5, 2020, Norma immediately called Lambert to ask who had cut M.L.'s hair and did not receive a response. Instead, Lambert claimed he did not know anything about the haircut.

37.     Defendant Logterman's actions of cutting strands of A.S. and M.L.'s hair violated written rules and policies set forth by the School District for all students and staff. (Ex. A).

38.     Neither Alice, Norma, A.S., nor M.L. encouraged, welcomed, nor consented to Logterman's haircuts.

39.     Because Defendant Lambert failed to direct Logterman to stop cutting Alice and Norma's daughters' hair, on March 9, 2020, Alice, Norma, and Lakota elders attended the School District's school board meeting.

40.     At the board meeting, Alice, Norma, and the elders specifically requested the school return the strands of A.S. and M.L.'s hair in order to properly dispose of the hair according to Lakota beliefs and practice.

41.     On or about March 10, 2020, Defendant Lambert sent Alice and Norma the letter previously identified as Exhibit B herein. Lambert attached to the letter a scrap piece of paper with a single strand of hair taped and a handwritten note "[A.S.] 4-4-2020." (Ex. B).

42.     Alice and Norma do not know whether the strand of hair belonged to A.S. or M.L. and, if so, where the strand of hair had been prior to being sent to Alice and Norma through the mail a week after it was cut.

43.     Alice and Norma did not receive any other strands of A.S. or M.L.'s hair.

44.     Neither A.S., M.L., Alice, nor Norma know where any remaining strands of hair are or whether they were stored and kept safe as required by their Lakota beliefs and practices.

**E. The Harm Caused**

45.     The School District's unwritten policy placed a substantial burden on Plaintiffs' free exercise of their traditional Lakota religion, heritage, and identity, their right to an education, and their right to direct the upbringing and education of A.S. and M.L.

46.     The School District's unwritten policy is degrading and embarrassing and causes anxiety for A.S. and M.L. about facing a haircut based on their race and religion. The unwritten policy serves no purpose other than to make A.S. and M.L. ashamed or resentful of their Native American race, traditional Lakota religion, heritage, and identity.

47.     The unwritten policy forced A.S. and M.L. to choose between attending school and having their hair cut at the price of practicing and expressing their traditional Lakota religion and identity.

48.     Alice and Norma fear that under either alternative, A.S. and M.L. will come to be ashamed of their Lakota identity, to resent their religious practice of not cutting their hair, and ultimately may even wish to abandon the beliefs that Alice and Norma have exercised their constitutional and human rights as parents to teach them.

49.     The incidents that led to this cause of action have caused Alice and Norma to recall the variety of culturally insensitive assimilationist policies that took place in the late

nineteenth and early twentieth centuries "designed to erase one culture and replace it with another[,]" including "converting Native[] [Americans] to Christianity" and separating Native American "youth from their families and kinship groups" so that children could be "Christianized" and "civilized."[4]

50.     After these events, A.S. and M.L. no longer feel welcome in the school environment and their behavior fundamentally changed at school. While A.S. and M.L. were students at Cody Kilgore Unified Schools Elementary of Defendant School District, A.S. and M.L. no longer wanted to go to school and instead pleaded to Alice and Norma to stay home sick for fear their hair would be cut again. A.S. and M.L. became upset every time Alice and Norma told them they had school the next day and A.S. had noticeably struggled more with her classes.

51.     Defendants' actions and omissions caused injury to Plaintiffs, emotional distress, and violation of their personal dignity.

52.     Defendant School District and Defendant Lambert failed to take corrective action when a harmful situation to students, including A.S. and M.L., were presented directly to them.

53.     Despite knowledge and adequate opportunity to learn of the misconduct of their agent and employee Defendant Logterman and to remedy such misconduct, Defendant School District and Defendant Lambert adopted, approved, and ratified the acts, omissions, and misconduct of Logterman.

54.     The School District is responsible for training employees, including Logterman.

55.     The School District failed to adequately train and supervise its employees, including Logterman, concerning Native American religious beliefs regarding their hair.

---

[4] Ryan Seelau, Article, *REGAINING CONTROL OVER THE CHILDREN: REVERSING THE LEGACY OF ASSIMILATIVE POLICIES IN EDUCATION, CHILD WELFARE, AND JUVENILE JUSTICE THAT TARGETED NATIVE AMERICAN YOUTH*, 37 AM. INDIAN L. REV. 63, 82-83 (2012-2013).

56.    The School District also failed to prohibit employees, including Logterman, from cutting Native-American students' hair without consent of the students' parents or guardians.

57.    The acts and omissions of Defendants School District and Lambert were so culpable as to constitute authorization of, deliberate indifference and acquiescence in, the unlawful conduct of Defendant Logterman.

58.    As a direct and proximate result of Defendants' acts and omissions, Plaintiffs have suffered emotional harm and the loss of their integrity and dignity, the loss of A.S. and M.L.'s security in school, the deprivation of their constitutional rights, and special damages in an amount to be proven at trial.

## IV. CLAIMS

### FIRST CLAIM – 42 U.S.C. §1983
FREE EXERCISE CLAUSE OF THE
1ST AMENDMENT TO THE U.S. CONSTITUTION
(ALL DEFENDANTS)

59.    Plaintiffs restate and incorporate the allegations of paragraphs 1-58 above as if fully set forth herein.

60.    Defendants' actions and unwritten policy as alleged herein were not neutral and generally applicable, and instead selectively imposed burdens on students with specific religious beliefs.

61.     The adoption and enforcement by the School District and Principal Lambert of its unwritten policy substantially burdens Plaintiffs' free exercise of their sincerely held religious beliefs, rooted in their Lakota religion, concerning their hair.

62.    Defendant Logterman cut A.S. and M.L.'s hair in violation of their sincerely held Lakota beliefs on at least a combined four different occasions pursuant to the Defendant School District's unwritten policy.

11

63.    By significantly inhibiting and constraining expression of their traditional Lakota religious tenets, Ms. Logterman's execution of the School District's unconstitutional policy or custom of cutting the hair of Native American students while checking for lice deprived Plaintiffs of their clearly established right to free expression of their religious beliefs.

64.    Defendant School District's unwritten  policy does not further any compelling governmental interest; nor is it the least restrictive means of, or rationally related to, achieving the School District's interest in hygiene.

65.    As a direct and proximate result of Defendants' conduct, each Plaintiff has suffered emotional harm, the loss of dignity, and the deprivation of their constitutional rights.

<u>SECOND CLAIM – 42 U.S.C. §1983</u>
DUE PROCESS CLAUSE OF THE
14TH AMENDMENT OF THE U.S. CONSTITUTION
(ALL DEFENDANTS)

66.    Plaintiffs restate and incorporate the allegations of paragraphs 1- 65 above as if fully set forth herein.

67.    Alice and Norma have exercised the fundamental constitutional and human right that every parent has to direct the upbringing and education of their daughters A.S. and M.L. according to the religious beliefs and cultural identity they espouse. Alice and Norma made this choice to prevent A.S. and M.L. from suffering the trauma of being made to assimilate and to deny or forget their Native American heritage and identity.

68.    The School District's unwritten policy does not bear any relation to their interest in hygiene.

69.    The School District's adoption and enforcement of the unwritten policy deprived Plaintiffs Alice and Norma of their liberty interest, secured by the Substantive Due Process

Clause of the Fourteenth Amendment in directing the upbringing and education of their

daughters A.S. and M.L.

THIRD CLAIM – 42 U.S.C. §1983
EQUAL PROTECTION CLAUSE OF THE
14TH AMENDMENT OF THE U.S. CONSTITUTION
(ALL DEFENDANTS)

70.    Plaintiffs restate and incorporate the allegations of paragraphs 1- 69 above as if

fully set forth herein.

71.    The Equal Protection Clause of the Fourteenth Amendment of the U.S.

Constitution provides that "[n]o State shall…deny to any person within its jurisdiction the equal

protection of the laws." This provision applies fully to municipal governments, including

Defendants.

A.    Discrimination Based on Religion

72.    The Equal Protection Clause prohibits governmental bodies from treating citizens

differently based on their religious beliefs.

73.    Religion is a fundamental right and suspect classification that triggers strict

scrutiny under the Equal Protection Clause. To meet such scrutiny, a governmental classification

is necessary to further a compelling governmental interest and must be narrowly tailored to that

interest.

74.    Native Americans are entitled to particularly heightened protection under the

Equal Protection Clause because they are a discrete religious group.

75.    The Defendants' unwritten policy treated Plaintiffs differently than other similarly

situated non-Native American families by singling out Native American families, including

Plaintiffs for haircuts based on their religious belief and identity, without a rational or

compelling basis by narrowly tailored means in violation of the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution.

76.    Unlike non-Native American families, Native American families must undergo a haircut during headlice checks pursuant to the unwritten policy in violation of their sincerely held religious beliefs regarding hair.

77.    By subjecting Native American families including Plaintiffs, to the Defendants' unwritten policy, the Defendants structurally deprived Native American families the "rights, privileges, and immunities" secured by the Equal Protection Clause and the U.S. Constitution causing Plaintiffs harm.

B.    <u>Discrimination Based on Race</u>

78.    The Equal Protection Clause prohibits governmental bodies from treating citizens differently based on their race.

79.    Race is a suspect classification that triggers strict scrutiny under the Equal Protection Clause. To meet such scrutiny, a governmental classification is necessary to further a compelling governmental interest and must be narrowly tailored to that interest.

80.    Native Americans are entitled to particularly heightened protection under the Equal Protection Clause because they are a discrete racial group.

81.    The Defendants' unwritten policy treated Plaintiffs differently than other similarly situated non-Native American families by singling out Native American families including Plaintiffs for hair cuts based on their race, without a rational or compelling basis by narrowly tailored means and displayed reckless indifference to in violation of the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution.

82.     By subjecting Native American families including Plaintiffs, to the Defendants' unwritten policy, the Defendants structurally deprived Native American families the "rights, privileges, and immunities" secured by the Equal Protection Clause and the U.S. Constitution causing Plaintiffs harm.

## FOURTH CLAIM
### TITLE VI RACIAL DISCRIMINATION
### (DEFENDANT SCHOOL DISTRICT)

83.     Plaintiffs restate and incorporate the allegations of paragraphs 1-82 above as if fully set forth herein.

84.     The School District's unwritten policy has violated rights guaranteed to A.S. and M.L. under Title VI of the Civil Rights Act, 42 U.S.C. § 2000d, which prohibits recipients of federal funding from discriminating against individuals on the basis of race.

85.     The School District treated A.S. and M.L. less favorably than their non-Native American counterparts in violation of 42 U.S.C. § 2000d by cutting their hair because of their race.

86.     Defendant School District intentionally, willfully, and without justification acted to deprive A.S. and M.L. of their rights, privileges and immunities secured by the laws of the United States, including their right to be free from racial discrimination in pursuit of their public education.

87.     The School District, despite knowledge and adequate opportunity to learn of Logterman's misconduct in cutting A.S and M.L.'s hair pursuant to the school's unwritten policy adopted, approved, and ratified the acts, omissions, and misconduct of Lambert and Logterman.

88.     As a direct and proximate result of the above-mentioned policies, Plaintiffs A.S. and M.L. have been adversely affected and deprived of their rights under Title VI of the Civil Rights Act.

## V. RELIEF REQUESTED

89.    Based on the foregoing, Plaintiffs pray for judgment against the Defendants as follows:

        A.      General and specific damages as allowed by law;
        C.      For attorney's fees pursuant to 42 U.S.C. §1988; and
        D.      For the costs of this action.

## VI.  DEMAND FOR A JURY TRIAL

90.    Pursuant to Rule 38(b) Fed. R. Civ. P., Plaintiffs demand trial by jury of all issues so triable.


Dated this 11th day of February, 2022.

                                      A.S. and M.L. by and through Parents, Natural Guardians, and Next Friends ALICE JOHNSON and NORMA LEROY, Plaintiffs


                            By:   /s/_Rose Godinez_____
                                      Rose Godinez, No. 25925
                                      ACLU OF NEBRASKA
                                      134 S 13th Street, Suite 1010
                                      Lincoln, Nebraska 68508
                                      (402) 476-8091
                                      rgodinez@aclunebraska.org
                                      *Attorney for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Rose Godinez, hereby certify that on February 11, 2022, a copy of the foregoing was filed

electronically via the Court's ECF system, which effects service upon counsel of record.

s/ Rose Godinez

Exhibit A

# Cody-Kilgore Unified Schools

# STUDENT HANDBOOK

## 2019-2020 Edition

Cody Kilgore Unified Schools
360 West 4th Street
Cody, NE 69211

Phone: (402) 823-4117
Fax: (402) 823-4275

## Head Lice

Students found to have live head lice or louse eggs will not be permitted at school and will be sent home.  Upon discovering the presence of any indication of lice or louse eggs the student's parent(s) or guardian(s) will be notified, and if appropriate will be asked to pick up the student from school immediately.

Students will not be permitted to return to school until the district finds that no live liceor eggs can be detected.  The parent(s) or guardian(s) will be required to treat the student and accompany the student to school to be examined.

The student cannot ride the school bus until the district has cleared the student to return to school.

## Health Problems Limiting Activities

Parents who do not want their children to play outdoors or participate in physical education for health reasons must send a written request to school. If a student persistently requests to be excused from these activities, the building principal or classroom teacher may require a doctor's verification.

Parents should notify principal or superintendent if their student has any special health problems such as diabetes, asthma, or the like.

## Homebound Instruction

The school district may provide a student with instruction in his or her home and under parental supervision if the student is physically or mentally ill or injured and unable to attend regular classes for an extended period of time. Homebound instruction shall be provided when the student's physical and mental condition are such that the student can benefit from instruction and no other provision will meet the student's educational needs.  If you believe that homebound instruction is appropriate for your child, please contact the building principal to initiate the appropriate process to determine eligibility.

## Homeless Children and Youth

Homeless students generally include children who lack a fixed, regular, and adequate nighttime residence, as further defined by applicable state and federal law.

It is the school's policy not to stigmatize or segregate homeless students on the basis of their status of being homeless.  Transportation for homeless

Exhibit B



CODY-KILGORE UNIFIED SCHOOLS

Dear Alice Johnson and Norma LeRoy,

On behalf of the Board of Education and the Cody-Kilgore School District, I want to thank you and your family for coming to the school board meeting on Monday March 9th and presenting on the Lakota culture. Your presentation was not only informational but extremely professional.

As a public school we try to recognize all of the different cultural beliefs that enter through our doors, but know that there are always new things to learn and adjustments to be made. We don't believe that this one meeting will be or should be the end of our conversation. We hope that this is a great starting point in working in collaboration with one another as we move forward.

Included in this mailing is the single strand of hair that you requested so that it may be properly disposed according to your cultural beliefs and practices. Moving forward, if the district suspects lice or nits on your child, a phone call will be made home for you to come and pick up your child from school.

Respectfully,

Adam Lambert
Superintendent of Schools

KILGORE ELEMENTARY SCHOOL
P:402-966-2291    F:402-966-2167

CODY JR/SR HIGH SCHOOL
P:402-823-4117    F:402-823-4275

360 WEST 4TH STREET, PO BOX 216, CODY, NE 69211

WWW.CODY-KILGORE.COM



A
4-4-2020

# Phrase Reading Practice

Number of words read correctly _____        Student Name

Time _____        Date

| | | |
|---|---|---|
| with mother | the white duck | a pretty home |
| (8) would like | in the window | on the floor |
| (16) to the school | he would do | went away |
| (24) the new coat | as he said | to the barn |
| (33) some bread | by the house | the little dog |
| (41) up here | he would try | to the house |
| (49) is coming | I will go | about him    it is |
| (58) was made | at once | for him    too soon |
| (66) | | |

Comments and Observations:

40

Exhibit C



CODY-KILGORE                    UNIFIED SCHOOLS

March 19, 2020

*Via E-mail*

Mr. Sipple and Ms. Godinez
ACLU of Nebraska
ajsipple@aclunebraska.org
rgodinez@aclunebraska.org

Dear Mr. Sipple and Ms. Godinez:

I received your letter dated March 13, 2020. I want to acknowledge your requests and provide you with a response prior to your requested deadline. I will not be providing any specific information now or to Ms. Johnson moving forward on any school personnel matter, because I am prohibited by law from doing so.

I have discussed this several times with Ms. Johnson and her family, and I appreciate their willingness to speak with me about it. I sent a letter regarding the incident, and we have discussed and established a plan for addressing situations in which head lice may be present. At the board meeting, Ms. Johnson invited individuals (elders and other family and community members) who came in support of her family and spoke on Ms. Johnson's behalf while also educating the board of education on their specific cultural beliefs. One of the individuals who spoke described the process taken to check for head lice at her own children's school located on Tribal grounds: the school cuts a single hair, tapes it to a piece of paper, and sends it home to the family. That is *precisely* the procedure that was used here. However, despite that suggestion at the meeting, we have established a plan with Ms. Johnson that does not include cutting a single hair to be examined. We will do a visual inspection only.

Ms. Johnson has specifically requested an individual apology from a particular staff member. Yet she has stated, "We have experienced little troubles but always talked them over with the superintendent. I always felt like he took care of the problems." The problem at hand for Ms. Johnson is not one of policy but one of personal conflict. Ms. Johnson and I have already arrived at an acceptable procedure moving forward for dealing with lice with her daughter.

For your long-term requests and specific staff training suggestions, the school district will absolutely consider those as we continue discussions around the presentation to the board and your letter. We plan to review your requests with legal counsel and will consider this request as the school district plans future staff training. Unfortunately, we have no idea when we will next be able to have staff training or curriculum planning. It may be many months from now due to school closures based on COVID-19.

As I stated in my letter to Ms. Johnson, we look forward to working with her and her family collaboratively and hope the discussion at the board meeting is a starting point for rebuilding the relationships. On that note, I have reviewed the news stories and social media comments related to this matter, and I would like to address those. There is considerable misinformation in the news stories. Certainly Ms. Johnson is free to state her feelings about this matter and media members are free to report on it. Their factual inaccuracy is disappointing. Similarly, social media posts "liked" by Ms. Johnson have involved actual threats or suggestions of violence ("Ooooooo I'd bring a gun and pop off!"). We tell students every day these constitute terroristic threats and not even a joking comment is appropriate in a school context. We hope Ms. Johnson and those she affiliates with on social media do not actually endorse those types of statements. I would appreciate it if the inaccuracies and the posts threatening or suggesting violence, especially against school staff, would stop in order to help everyone move forward.

One of the news stories mentioned Ms. Johnson's daughter struggling since this matter began. I would greatly appreciate the chance to speak with Ms. Johnson about her specific concerns related to her daughter(s). Please have her reach out to me to discuss what she has been seeing so myself and our staff can consider what we can do to help, especially in light of our school closure.

Sincerely,

Adam Lambert,
Superintendent